IN THE UNITED STATES DISTRICT COURT FILED
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KWEKU HANSON | ) | DOCKET #3: 02cv960 (CFD) |
| individually and on behalf of | ) | |
| all others similarly situated | ) | US DISTRICT COURT |
| Plaintiffs | ) | HARTFORD CT |
| | ) | |
| v. | ) | |
| | ) | |
| OCWEN FEDERAL BANK, ET. AL. | ) | |
| Defendants | ) | |
| | ) | OCTOBER 10, 2003 |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO MODIFY AMENDED SCHEDULING ORDER AND FOR RULE 16 SCHEDULING CONFERENCE

On September 26, 2003 the Moss Codilis group of defendants filed a pleading captioned "Motion to Modify in Part Scheduling Order Entered April 29, 2003." [Docket Entry 183]. On September 30, 2003 the Ocwen defendants (collectively "Ocwen") and Litton filed virtually copycat motions (respectively Docket Entry 182 and 186) to modify the April 29, 2003 Scheduling Order.[1] The dawning of the deadlines set by this Court in its February 27, 2003 and April 29, 2003 Scheduling Orders—which at the time they were imposed seemed light years away—is now giving these corporate and individual malefactors considerable angst.

ORAL ARGUMENT IS REQUESTED
TESTIMONY WILL BE REQUIRED

---

[1]    Ocwen specifically indicated that it did not desire oral argument nor require testimony in support of its motion; Moss Codilis' and Litton's motions were silent on the issue. By operation of D.Conn.L.Civ.R. 7, the latter defendants are deemed to have waived any claim to oral argument or testimony.

-1-

Consequently, interspersing fact with fiction, these apoplectic defendants seek to postpone their day of reckoning by offering spurious and specious rationales as to why the carefully calibrated Amended Scheduling Order should be set aside. Plaintiffs hereby respond to the bevy of bogus motions with a consolidated response, invoking along the way the doctrines of unclean hands, waiver, laches, and equitable estoppel. Plaintiffs, who believe that Defendants' motions are derisive, dilatory and designed to derail a decision on Defendants' demonstrably diabolic debt deception, ask this Court to bring to bear the demonstrable decisiveness with which it disposed of the Doody dispute.[2] This is because while Howdy Doody was a mere marionette and its right to residence a matter of sentimental value, this lawsuit involves the rights and aspirations of thousands of flesh-and-blood Americans wronged by particularly Ocwen's avarice and concerted misconduct to a degree probably unparalleled in American annals.[3]

---

[2]    See Detroit Inst. of Arts Founders Soc'y v. Rose, No. 3:99CV221, 127 F. Supp. 2d 117 (D.Conn. 2001). There, this Court, applying Solonic (or Solomonic) wisdom, decided that the popular puppet must stay at the Detroit Institute of Arts, a foreclosure-free fortress where famous puppets like Kermit the Frog live out their days unmolested by any fraudulent financial frights.

[3]    As Plaintiffs' prior pleadings professed, even Fairbanks Capital which (despite having replaced its entire management team), is now the subject of criminal probes, Congressional hearings, and FTC investigations---and which incidentally, like Washington Mutual, has apologized to consumers

1.    The Unclean Hands Doctrine

The maxim of unclean hands is based on the principle that "since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff."[4] 11A C. Wright, A. Miller, M. Kane, Federal Practice and Procedure: Civil 2d §2946, at 108 (1995). "[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co., 324 U.S. 806, 814-15 (1945); see also Warner Bros. Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983) ("[T]he defense of unclean hands applies only with respect to the right in suit.").[5]

Accordingly, a litigant will be barred from relief by the clean hands maxim where he has been guilty of unlawful or inequitable conduct in matter with relation to which he seeks relief. Concededly, "[t]he unclean hands defense is not an

---

for scandalous servicing schemes, did not manage to rack up as many www.ripoffreport.com and FTC complaints as Ocwen has done.

[4]    In the context of the motions at bar Defendants, as movants, are the "plaintiffs" for unclean hands analysis.

[5]    A party relying on clean hands doctrine must show that he himself has been injured, and wrong must have been done to that party himself and not to some third party. Price v. Ridler, 373 S.W.2d 59.

-3-

automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction." 11A Wright, Miller, Kane, <u>Federal Practice and Procedure: Civil 2d</u> §2946, at 111. "The doctrine of unclean hands also may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff." *Id.* § 2946, at 112; *cf.* <u>A.H. Emery Co. v. Marcan Prods. Corp.</u>, 389 F.2d 11, 18 (2d Cir. 1968).

Thus, in determining whether the doctrine of unclean hands bars an equitable remedy, courts are permitted to weigh the wrongdoing of the plaintiff against the wrongdoing of the defendant. 11A Wright, Miller, Kane, <u>Federal Practice and Procedure: Civil 2d</u> §2946, at 112. Where the wrongful conduct of both parties are remarkably similar in quality and extent, equity requires this Court to look to whether the defendants' wrongdoing alleged in the complaint is of a greater magnitude than the plaintiff's wrongdoing. <u>Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC</u>, 149 F.3d 85 (2d Cir. 1998).

### 2. Laches/Undue Delay

"Laches is based on the maxim, '*vigilantibus non dormientibus aequitas subvenit*,' meaning 'equity aids the vigilant, not those who sleep on their rights.' <u>Ivani Contacting Corp. v. City of New York</u>, 103 F. 3d 27 257, 259 (2d Cir. 1997). A party asserting a laches defense must show that "the [movant]

-4-

has inexcusably slept on [its] rights so as to make a decree against the [opponent] unfair." Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 65 (2d Cir. 1983). Laches additionally requires a showing by the opponent "that it has been prejudiced by the [proponent's] unreasonable delay in bringing the action." Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996). Laches "implies a merely passive consent." Sara Lee Corp. v. Kayser-Roth Corp., 81 F. 3d 455, 460, 462 (4th Cir. 1996); see also Kellogg Co. v. Exxon Corp., 209 F.3d 562, 569 n.2 (6th Cir. 2000).

In the case of laches, "courts construe the [proponent's] unreasonable delay to imply consent to the [opponent's] conduct." Conan Props., Inc. v. Conans Pizza, Inc., 752 F. 2d 145, 152 (5th Cir. 1985). Thus, laches bars an equitable claim where the proponent has unreasonably and inexcusably delayed, resulting in prejudice to the opponent. To prevail on this defense, the opponent must show that: "(1) the proponent knew of the opponent's misconduct; (2) the proponent inexcusably delayed in taking action; and (3) the opponent was prejudiced by the delay."[6]

---

[6]    A party asserting an equitable defense such as laches must demonstrate that it comes before the court with clean hands. See Frankel v. Central Moving & Storage Co., No. 95 1 CV. 6330( BN), 1997 WL 672003 (S.D.N.Y. Oct 29, 1997) ("To prove the equitable defense of laches, [opponent] must show . . . good faith conduct on [its] part.").

The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case. The inquiry is a factual one. The determination of whether laches bars a proponent from equitable relief is entirely within the discretion of the trial court. <u>Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.</u>, 17 F.3d 27 38, 44 (2d Cir. 1994); *see also* <u>Gardner v. Panama Railroad Co.</u>, 342 U.S. 33 29, 30 (1951) ("the existence of laches is a question primarily addressed to the discretion of the trial court").[7]

### 3.  Equitable Estoppel

The federal doctrine of equitable estoppel applies when "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." <u>Kosakow v. New Rochelle Radiology Associates, P.C.</u>, 274 F.3d 706, 725 (2d Cir. 2001). The elements of the defense include proof that the movant made a misrepresentation of fact to the opponent with reason to believe that the opponent would rely upon it; that the opponent did reasonably rely upon it; and that the opponent was harmed by the reliance. *Id.* Ordinarily, whether the defense applies is a question of fact. *Id.* It is unnecessary for the opponent to show

---

[7]     *Cf.* <u>Hermès Int'l v. Lederer De Paris Fifth Avenue, Inc.</u>, 219 F.3d 104, 107 (2d Cir. 2000) (de novo laches review).

-6-

that the movant intended to deceive the opponent when it made the representation. *Id.* at 726; *see also* <u>Heckler v. Commun. Health Servs.</u>, 467 U.S. 51, 59 (1984).

Estoppel, much like laches, requires that the asserting party has in good faith become disadvantaged by a changed condition. An allegation that a movant's act induced an opponent to change positions or take action to his detriment, or facts from which such action could be inferred, is essential to plea of estoppel. <u>U.S. ex rel. Coates v. St. Louis Clay Products Co.</u>, 68 F.Supp. 902 (D.C. Mo. 1947); <u>Coonce v. Aetna Life Insurance Co.</u>, 777 F. Supp. 759 (W.D. Mo. 1991).

### 4.    The Voluntary Waiver Rule

Waiver is the "intentional relinquishment of a known right." <u>Hamilton v. Atlas Turner, Inc.</u>, 197 F.3d 58, 61 (2d Cir. 1999). It is distinguishable from forfeiture. *Cf.* <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938). Waiver, like estoppel, is an equitable doctrine devised to prevent wrong being done to innocent parties. If waiver is implied from conduct, conduct must clearly and unequivocally show a purpose to relinquish right. In other words, to rise to the level of implied waiver, actions must be so manifestly consistent with an indicative of intention to renounce particular right or benefit that no other reasonable explanation of conduct is possible.

-7-

5.    <u>Defendants' Censurable Conduct Implicates The Maxim Of Unclean Hands; Laches; Estoppel; And/Or Waiver.</u>

In a post online on the OCN Message Boards in the Finance Forum at <u>www.yahoo.com,</u> a mysterious mortgagor by the moniker of 'Cinderellabelladante' muses that Ocwen is a ballerina dancing pirouettes in the federal courtroom. Ocwen, the poster observes, has perfected the art of going through the motions—no pun intended—while staying absolutely mute and refusing to respond meaningfully to Plaintiffs' discovery demands. While Ocwen may be performing pirouettes with all the precision of a pachyderm in pumps, it will take more than the temerity of a Tyrannosaurus Rex for its motion for more time disguised as a motion to modify to be validated—that is if Plaintiffs have anything to say about it.

The Moss Codilis group of defendants, still sticking to the fiction that Moss Codilis is a legitimate law firm doing legal work for Ocwen, also seek to thwart their day of reckoning by interposing a motion containing knowingly false allegations.[8] In view of the fact that every legitimate law firm in America is assigned a unique bar number by the judicial authorities in its home state, this Court should *sua sponte* require (and Plaintiffs

---

[8]    Pursuant to the requirements of Fed.R.Civ.P. 11 and D.Conn.L.Civ.R. 16(g)(1), Plaintiffs will, by separate notice to counsel for the intractable Moss Codilis defendants, demand a retraction of false statements and offer Moss Codilis an opportunity to cure by recantation, prior to formally filing a motion for sanctions with this Court.

-8-

challenge) Moss Codilis to produce a properly authenticated or independently verifiable juris or official bar number issued before *October 1, 2001* by any federal or state court for "Moss Codilis, Stawiarski, Morris, Schneider & Prior, LLP."[9]

Litton, which is the subject of a separate, more expansive, nationwide, putative consumer class action (where a federal judge has seen fit to expeditiously impose a preliminary injunction), also seeks to feign innocence while clamoring for delay. Plaintiffs ask this Court to deny Litton's motion to modify.

"This whole drama---or farce---is a classic example of how powerful people can rationalize anything, bending and rewriting rules to fit the game they want to play. It is like the Calvinball game from the old 'Calvin and Hobbes' comic strip: you make your own rules and then decide if you've won or lost."[10] Not only does each defendant enter the Courthouse with soiled hands vis-a-vis the Machiavellian mishandling of mortgagor monies; during the course of this litigation, each defendant has engaged in contumacious conduct right under the nose of this Court. Ocwen, Moss Codilis and Litton have each refused to properly

---

[9]    If Moss Codilis' counsel can produce an attested-to court clerk certification, Plaintiffs pledge to promptly petition under Fed.R.Civ.P. 41 to voluntarily dismiss all but FDCPA and racketeering-related counts against all Moss Codilis defendants.

[10]    Allan Sloan, <u>Newsweek</u> September 29, 2003, p.43.

respond to discovery demands, and the first two submitted deliberately deceptive, defective, declarations designed to derail this Court's discharge of its duties vis-a-vis the pending Rule 12 motions.[11]

Even while evading Plaintiffs Interrogatories and Requests for Production served on it on April 1, 2003, Ocwen in the mid-summer turned over a minuscule amount of documents, some of which are doctored. Three and a half months after sending Plaintiffs' counsel about 250 pages of material, Ocwen has yet to file a perennially promised privilege log for the portions of the documents redacted.[12] Ocwen, which reputedly tries to tailor its responses to Office of Thrift Supervision and Better Business Bureau consumer complaints, has tried to craft its records

---

[11]     Ocwen's Oedipus-complex declarations omitted material information about Erbey's roles at Ocwen Financial and Ocwen, respectively; Moss Codilis' declarations deceptively averred that *none* of the individual lawyers and law firms named as defendants had ever conducted business or practiced law in Connecticut.

[12]     Conspicuously missing from the distributed documents are any copies of: monthly invoices billed to Hanson; numerous letters and faxes exchanged with Hanson about rate adjustments, loan defaults; proof of escrow disbursements from Hanson's account; and miscellaneous matters. Assuming that Ocwen takes to heart Magistrate Judge Garfinkel's admonition in denying Plaintiffs' motion for electronic data preservation, that if a showing of surreptitious spoilation of evidence is made, Plaintiffs will be entitled to an adverse jury instruction, it is nevertheless still crucial for this Court to compel Ocwen to cease its charade. In this regard, the contempt adjudication of Judge Wexler in Poe v. Ocwen, No. 00CV913 (4/2/2003), attached hereto as Exhibit 1, is particularly persuasive.

- 10 -

production to what Plaintiffs have already tendered in discovery or filed as exhibits, or to what records---such as closing documents---Ocwen presciently presumes Plaintiffs have.

Likewise, the Moss Codilis defendants, in their feint at furnishing records relating to Hanson and/or the numerosity, commonality, typicality, adequacy, manageability criteria of Rule 23, turned over just a paltry pile of papers previously submitted by Plaintiffs with particular pleadings, not since supplemented.

Litton, largely living up to its loathed reputation among harangued homeowners as a servicing company which rarely leaves a paper trail, has not even produced a shred of paperwork from Hanson's loan file. Accordingly, each defendant at bar comes into Court with mud-stained hands. None having purged itself, each defendant is undeserving of the benefits of equitable relief!

Plaintiffs have already alleged that they have relied on Defendants' inaction over the past several months as indicia that Defendants were jostling to join the joust and would not seek spurious delays. Thus, Defendants should be equitably estopped from benefitting from the misleading signals they sent to Plaintiffs regarding the posture of the discovery.

Accepting the descriptions of the conversation and the chronology of the events as presented by Plaintiffs, this Court can conclude as a matter of law that the conduct establishes that

- 11 -

Defendants could not have reasonably relied upon the April 14, 2003 deposition of Hanson either to relieve them of their obligation to file dispositive motions, or to respond to the motions for class certification in conformity with the Amended Scheduling Order. Defendants concede as much when they assert that they have already given notice that they will seek to depose Hanson further and compel production of additional documents. Thus, Defendants waived any right to resort to any modification.

Laches bars Defendants' motions at bar. This is because Defendants deliberately delayed declaring their right to a revision of the Amended Scheduling Order until the very last minute. The diabolical delay, if judicially endorsed, would work to the disadvantage and prejudice of Hanson and the putative class of harangued homeowners he seeks to represent. <u>Metropolitan St. Louis Sewer District v. Zykon</u>, 495 S.W.2d 643 (Mo. 1973).

6.    <u>Moss Codilis' Contrived Claim Is Demonstrably Dilatory</u>

Moss Codilis' motion correctly observes that Phase One non-expert witness discovery (as delineated in extant Orders), was to be concluded by October 1, 2003, and that with respect to both the merits of Hanson's class claims and the criteria of Rule 23, the deadline was July 1, 2003. Moss Codilis is also accurate when it represents Plaintiffs failed to file any expert witness designations regarding Phase One discovery by August 1, 2003.

- 12 -

However, Moss Codilis blatantly blabbers when it states that the deposition of Hanson which was noticed and began on April 14, 2003 was not completed because "the plaintiff refused to be deposed by the Moss Codilis defendants after Ocwen completed its questioning, and because the plaintiff failed to provide the documents and other written response sought by the Moss Codilis defendants in discovery."[13] Moss Codilis' engages in further egregiousness by bogusly stating that "Hanson would not agree to a date on which the deposition could be continued." This is again about as deliberate a misrepresentation as can be had, and is controverted not only by the videotape and/or Transcript of Hanson's April 14, 2003 deposition,[14] but is challenged by Moss Codilis own communications and conduct.[15]

---

[13]    Contradictorily, Moss Codilis stated in the paragraph preceding that quotation that "the plaintiff refused to be deposed by the Moss Codilis defendants after Ocwen *completed* its questioning . . . ." Either Ocwen finished or did not finish its questioning, and Moss Codilis cannot eat its cake and have it.

[14]    At the tail-end of the deposition, when counsel (undersigned) interjected that it was past 5:30 p.m., Ocwen's counsel says "we'll come back to the . . . the computer on [April 23rd; could I ask just one final question? I will come back on 23rd or whenever we resume the deposition to the issue of the computer-tampering." Subsequently, *Ocwen* wrote to Plaintiffs, indicating that it was putting off completing the deposition until further notice (which has never been forthcoming). It is therefore false that *Plaintiffs* have refused to present Hanson for a continued deposition limited to 3 hours.

[15]    *Cf.* Moss Codilis motion for permission to depose Hanson for 14 hours [Docket Entry 159]. This motion, not opposed or otherwise objected-to by Plaintiffs, *never* once asserts that Moss

At no juncture whatsoever did Hanson, cognizant of his responsibilities both as an Officer of the Court and as a puny plaintiff, refuse to be deposed by any defendant in this matter. Indeed, Hanson was salivating to state in sworn statements what malfeasances the Moss Codilis cohorts have been up to; Hanson has been ruminating whether and when to file grievances against the lawyers and law firms comprising the individual Moss Codilis defendants, for their facilitation of feckless fraud.[16] Further, Plaintiffs' counsel never refused a request by Moss Codilis (or any other defendant, for that matter) to depose Hanson.[17]

*Assuming arguendo* that Hanson dodged being deposed by Moss Codilis, it is curious that Moss Codilis would wait until *three months* after the July 1, 2003 deadline for non-expert witness

---

Codilis is having problems deposing Hanson, despite Moss Codilis' glib effort to recast it as a "motion to compel the production of plaintiff for deposition." [Motion to Amend, p.3]. If Hanson's alleged refusal to submit to oral examination occurred subsequent to the filing of Docket Entry 159, then Moss Codilis must prove it by way of emails, faxes, letters or other extant communications to Plaintiffs' counsel demanding a deposition on a date certain other than April 14, 2003.

[16]     Moss Codilis not only has masqueraded as a law firm collecting *attorney's* fees, when it is only registered in states such as Connecticut as a collection agency (the only "law firm" to do so), but---bombshell---has been instrumental in propagating falsified or fraudulent foreclosure Affidavits of Indebtedness!

[17]     Indeed, not a single defendant in this action objected, even in a muffled manner, when alerted ahead by Plaintiffs' counsel that Hanson would be taking a trip to his native Africa from June 17, 2003 through July 9, 2003. There was not even a single dissenting opinion voiced!

depositions to lodge a complaint with this Court. Seen in that context, Moss Codilis' claim on September 30, 2003 that absent Hanson's deposition, discovery compliance and document production, the Moss Codilis defendants cannot file the dispositive motions due by October 1, 2003 (the day following the filing of their motion) is totally bogus.

It is outlandish for Moss Codilis *now* to propose that the Court postpone the submission of dispositive motions until three months after the deposition of Hanson or the Court's disposition of Docket Entries 147, 159 and 175. Moss Codilis seeks to defer adjudication of the class certification motion until many months after the original October 15, 2003 deadline, in a matter where Plaintiffs filed their motion for class certification in January, 2003 and controlling precedent mandates that a determination thereon be made "as soon as practical." Fed.R.Civ.P. 23(a).

While Plaintiffs do not see any need for a Rule 16(b) conference this late---the Court having last Spring summarily denied *Plaintiffs'* Rule 16(b) request---they do not necessarily oppose *any implicit request for a status conference under D.Conn.L.Civ.R. 16(a)*. Nevertheless, Plaintiffs billboard their intention to seek at any such Rule 16 conference, an immediate hearing on their Amended Motion for Preliminary Injunction.[18]

---

[18]    Too many lives are being ruined by Defendants' fraud, warranting *immediate* judicial "cease and desist" intervention.

- 15 -

In the final analysis, the Court must make meaningfully clear to Moss Codilis (and *every other party* to this litigation), that it will tolerate no further delays or attempts to derail an already attenuated Scheduling Order. Plaintiffs respectfully request the Court to deny Moss Codilis motions.

7.    Ocwen's Oedipus-Complex Meritless Modification Motion

Ocwen plaintively complains in its motion at bar that "the response [by Hanson] contained virtually no substantive response to Ocwen's discovery requests." If the words "Hanson" and "Ocwen" were transposed, then, perhaps Ocwen's motion might make more sense. Ocwen coyly buries in a footnote a grudging concession that it "received a box of documents that Hanson produced in July 2003 to the Moss Codilis defendants." [Owen's Motion to Modify, p.2 (*really page 3 erroneously paginated*) at footnote 2].[19] Ocwen, with its legendary evasion of discovery at all costs,[20] now proudly points an accusatory finger at Plaintiffs' camp.

_____

[19]    Counsel for the parties agreed that Day, Berry & Howard would receive *one* set of documents from Plaintiffs and Defendants would replicate those records themselves. Therefore, it is balderdash that "it is not clear whether those documents are intended to respond to Ocwen's discovery requests."

[20]    Exhibit 1 hereto, also filed with Docket Entry 142, is a Tennessee judge's contempt finding against Ocwen in a case where even Ocwen's retained counsel withdrew due to Ocwen's discovery misbehavior---a lesson largely lost in this litigation. Exhibit A to Docket Entry 157 was an Alabama Supreme Court denial of Ocwen's classic efforts to judicially justify its evasion of discovery in another consumer fraud case. A pattern and practice of playing pranks on plaintiffs becomes plain here.

- 16 -

Ocwen insists that Hanson comply with its discovery demands, yet does not believe that the gander must also drink the potion tendered by the goslings. This Court, like so many others which have carefully studied the competing claims, should expose Ocwen's naked attempt to delay its day of reckoning by refusing to choreograph Ocwen's pathetic pirouettes. Aside from the fact that a court considering the sheer numerosity[21] and character[22] of the consumer complaints against Ocwen cannot help but be struck by the constancy of accusation of feckless fraud in virtually every one of the tragic cases characterizing Ocwen's clear and present danger to American homeowners, the drumbeat goes on, unimpeded by any judicial injunction; unmolested by any regulatory agency; unconstrained by any professional responsibility; unfazed by any sense of personal ethics; governed only by greedy gamesmanship and polluted political prowess.

---

[21]    52,700 complaint pages (up from 51,919 in July, 2003) lodged at HUD; 650 complaint pages on file at FTC. All paperwork pinpoints a pernicious pattern and practice of patent piracy.

[22]    Over 600 complaints at www.ripoffreport.com; 54-plus email complaints in August, 2002 at customerrelations@ocwen.com. Over 1,000 eerie emails and 100 corroborated consumer complaints castigating Ocwen sent to Plaintiffs. Also, advocacy groups ACORN and NCRC and countless lawyers, have stated via various channels, that they will ostracize Ocwen for fraud, or have never seen such prevarication and pilfering. Curiously, in the Alabama Supreme Court opinion in In re Ocwen, the justices noted without further comment that after initially asserting that the borrower there owed a total of $3,948.63, Ocwen thereafter *increased* the amount allegedly owed by $1,091.49 *every successive month*. The only truism in all this seems to be the adage that Justice is *blind*.

- 17 -

Ocwen has *not* diligently complied with this Court's Scheduling Orders at all, contrary to its representation. Ocwen has yet to turn over run-of-the-mill communications and records relating to Hanson and/or to properly identify persons involved in Hanson's loan servicing. Ocwen most certainly has utterly failed to release any non-privileged, statistical or quantitative information which could be used by Plaintiffs to ascertain whether the requirements of Rule 23 are apparent.[23]

Particularly pertinent to the disposition of Ocwen's motion at bar is the fact that Ocwen squandered its time during the deposition of Hanson. Ocwen's lead counsel drew unwarranted inferences from certain responses by Hanson that he droned on at length through his seven hours of direct examination while barely broaching the requirements of Rule 23.[24] It is also a factual fabrication when Ocwen states that "plaintiff [failed] to provide written discovery and documents, and [failed] to appear for a full deposition." [Ocwen's Motion to Modify, ¶6]. Aside from the fact that this Court might at some juncture contemplate censuring

---

[23]    *Cf.*, footnotes 20, 21 and 22, *supra*. Not holding their breath for Ocwen's Rip van Winkle approach to discovery compliance, Plaintiffs have been forced to become ferrets to find the facts *they* need to meet their Rule 23 requirements.

[24]    Ocwen has not asked for more time (other than 3 more hours courteously accorded by Plaintiff's counsel), and Plaintiffs would vigorously oppose any additional time for depositions by, or on behalf of, Ocwen.

- 18 -

Ocwen for its cheat-and-retreat tactics in this litigation,[25]

Ocwen has adduced *zero* good cause to enlarge the discovery regime

to reward its pernicious piracy. Nor, under the totality of the

circumstances, does *any* good cause exists to delay the resolution

of Plaintiffs Rule 23 motion, which has been pending since

January, 2003.[26]

---

[25]    Plaintiffs have stated on more than one occasion that Ocwen has demonstrably directed damaging viruses at Hanson's computer, an assertion never wisely challenged under oath by any ranking representative of Ocwen. Plaintiffs also believe, consistent with Fed.R.Civ.P. 11, that some of the discovery documents delivered June 20, 2003 by Ocwen are spurious and were created just to establish a paper trail for this litigation.

[26]    Ocwen has all the facts from which to craft an opposition to Plaintiffs' motion for nationwide class certification. It has the 45 borrower Affidavits previously filed by Plaintiffs; it has the 650 FTC complaints; it has Plaintiffs' Amended Complaint and has deposed Hanson for seven hours; it presumably knows the identities of the 50-customers whom Hanson sent controversial emails to in September, 2002 after they each complained to customerrelations@ocwen.com about loan servicing malfeasances. Challenging commonality, typicality and numerosity should be as much a cakewalk for Ocwen as a catwalk is for supermodels.
    Ocwen is represented by the world's largest law firm in tandem with Connecticut's second largest law firm, and is benefitting from close cooperation with the amalgamated Moss Codilis-affiliated law firm defendants and their local counsel (Connecticut's largest law firm). Crucially, Ocwen has received and reviewed Plaintiffs' motion for class certification and supporting memorandum of law. Ocwen knows from meticulously monitoring online forums at www.badbusinessbureau.com and www.yahoo.com what its alleged customers, employees, and investors are saying about it. Ocwen has self-admittedly done exhaustive background research on Hanson and Plaintiff's counsel and can controvert their adequacy. Ocwen knows the scope of the injunctive and monetary relief sought by Plaintiffs and needs neither drink a magic potion nor recite a magic formula to address whether a putative class action of such magnitude is

- 19 -

8.    <u>Litton Loan's Lame Preclusion/Postponement Platitudes</u>

Turning to Litton, it becomes clear that this Texas lone ranger is not setting any better of an example than its Florida co-conspiratorial cohorts. Litton, like Ocwen, received over 2,000 pages worth of discovery documents channeled through Attorney David Bizar of Day, Berry & Howard at his express request. Those discovery documents concededly contained scant material on Litton but, at the juncture when they were turned over, Plaintiffs had only a smattering of documents attesting to Litton's leadership in the area of servicing fraud, other than what had invariably been filed alongside previous pleadings or what arguably amounted to attorney-client privileged material.

At first blush, Litton's restrictive recitation of the procedural history of this case seems particularly persuasive: Litton has assiduously complied with its obligations under the Scheduling Order, and Hanson has hideously hibernated without tendering a single shred of paper or objecting timely to discovery;[27] Hanson has refused to be deposed by Litton's lawyers, and Plaintiffs' counsel has stonewalled Litton. Litton looks slam-dunk set to win like *Larry* Bird, on the court of justice.[28]

---

manageable by a Connecticut federal judge.

[27]    Plaintiffs will answer Litton's request for preclusion.

[28]    Inadvertent delays aside, Plaintiffs refrained from fiddling during the scorching summer; rather, cued by the ant,

- 20 -

This Court, as referee, should not be so easily misled by Litton's lame limericks. This is because Litton, to its credit, has turned over virtually nothing at all,[29] leaving Plaintiffs to wonder what it is hiding in its hands. While it may be that Texas residents have a right to carry concealed weapons and wear gallon sized-hats to shield them from exposure to the sun, that is not the spirit required by the rules of discovery. Connecticut's federal rules require sunshine as the overarching principle of discovery, and permits discovery of all matters not privileged. Consequently, although it's supporting Memorandum of Law is long on histrionics, the motion at bar of Litton (facing likely nationwide class certification in a Tennessee federal case), likewise flunks the good cause standard.

To the extent the Court is concerned with, or sympathetic to, Litton's purported plight in not having been able to properly prepare and file dispositive motions or oppose Plaintiffs' motion for class certification because it has not deposed Hanson, Plaintiffs remonstrate that (1) the fault lies in Litton itself;

---

Plaintiffs gathered grains of evidence for systematic sustenance of their Connecticut court crusade during dark, dreary December.

[29]    Using "blush and dash" tactics, Litton has not even answered cursory queries about Hanson's loan, much less offered up in-depth responses which would enable Plaintiffs to move to voluntarily dismiss Litton pursuant to Rule 41 if indeed it had no culpability in Hanson's loan losses.

(2) Plaintiffs are equally deserving of judicial solicitude.[30]

Consequently, Plaintiffs propose and invite the following:

1. Rather than postpone the timetable extant for more than half of this year and permit the drip-drip dispensation of delayed "day-in-court" justice that cheated consumers are clamoring for, the Court can enlarge—if it must—the discovery period without correspondingly enlarging or shifting any other Scheduling Order deadline. This would substantially accommodate Defendants' bad faith, ill-timed motions to work Hanson over, while preserving the integrity of the judicial thought-process that went into the conscientious crafting of the Amended Scheduling Order in the first place.[31]

2. *If* the Court decides to revisit and revamp the extant Scheduling Order,[32] Plaintiffs ask the Court to immediately hear

---

[30]    To the extent the Court is inclined to grant any defendant an expanse of time to conduct any discovery, including depositions, the Court must act even-handedly to accord the same courtesy to Plaintiffs, who have been victimized by Defendants's discovery charades.

[31]    Under this proposal, Defendants can each file tardy dispositive motions or belated briefs regarding class certification, along with motions for permission to accept brief filed out of time. Plaintiffs will rapidly respond, and then this Court can dispose of those motions appropriately. Moss Codilis and Litton, which never began to depose Hanson due to their own fastidiousness about waiting until Ocwen was done deposing Hanson, can depose Hanson at any time (subject to reasonable re-notice, of course). Ocwen, too, can have its 3 hours anytime.

[32]    Voiding the Scheduling Order now opens a Pandora's Box.

their Amended Motion for Preliminary Injunction. Fairness demands expeditious evaluation of Plaintiffs' interlocutory injunction.

If Defendants (who each maintain that Amended Complaint's claims are mere hubris, and who are confident in this Court's ability to impartially adjudicate the controversy) prevail on Plaintiffs' preliminary injunction, then the Court can reset the clock on the litigation per Defendants' desires. However, whereas Plaintiffs cautiously consented in early February to deferral of the preliminary injunction until after a class certification hearing---thinking that such a hearing would occur quickly, they will no longer stipulate to postponed adjudication of said preliminary injunction motion, and no longer wish to have any revamped class certification schedule precede it.[33]

For the foregoing reasons, and for such other reasons as may by them be orally argued at a hearing hereon, Plaintiffs ask that Defendants' motions to modify in any fashion the Scheduling Order be denied. Additionally, Plaintiffs ask that Litton's petition to preclude, embedded in its motion to modify, be denied. Defendants squandered the summer season shuffling and singing. Like lanky locusts lingering long past Labor Day, they must learn a lesson.

---

[33]    Ocwen's assets are shrinking, its foreclosure ferocity is accelerating, and weary witnesses wail, as this litigation limps. Due process, the bedrock on which fairness is founded, demands accelerated action; and there will be no seismic result to Cardozo's Edifice of Justice.

- 23 -

Respectfully submitted,

_____

Paul M. Ngobeni (#ct08187)
Law Offices of Paul Ngobeni
914 Main Street, Suite 206
East Hartford, CT 06108
Telephone: (860) 289-3155
Facsimile: (860) 282-7479

## CERTIFICATION

A copy of the foregoing Plaintiffs' **Omnibus Opposition to Defendants' Motions to Modify Amended Scheduling Order and for Rule 16 Scheduling Conference** was served on October ___13___, 2003 by first-class mail, postage prepaid, on all counsel of record, and the *pro se* party:

| | |
|---|---|
| Steven M. Greenspan, Esq.<br>David M. Bizar, Esq.<br>Day, Berry & Howard LLP<br>CityPlace I<br>Hartford, CT 06103-3499<br>(860) 275-0100 Fax (860) 275-0343 | Matthew Budzik, Esq.<br>Francis J. Brady, Esq.<br>Murtha Cullina LLP<br>CityPlace I, 185 Asylum Street<br>Hartford, CT 06103<br>(860) 240-6000 Fax (860) 240-6150 |
| Basil S. Shiber, Esq.<br>Richard G. Carlston, Esq.<br>Miller, Starr & Regalia<br>1331 N. California Blvd. 5th Floor<br>P. O. Box 8177<br>Walnut Creek, CA 94596<br>(925) 935-9400 | Theodore R. Scarborough, Esq.<br>Sidely, Austin, Brown & Wood<br>Attorneys at Law<br>Bank One Plaza<br>Chicago, IL 60603<br>(312) 853-7036 Fax (312) 853-2236 |
| Luigi Spadafora, Esq.<br>Peter R. Stark, Esq.<br>Winget, Spadafora & Schwartzberg<br>45 Broadway, 19th Floor<br>New York, NY 10006<br>(212) 221-6900 Fax (212) 221-6989 | Kweku J. Hanson, Esq. (*Pro Se*)<br>Law Offices of Kweku J. Hanson<br>487 Main Street, Suite Two<br>Hartford, CT 06103-3007<br>(860) 728-5454 Fax (860) 548-9660 |

_____
**Paul M. Ngobeni, Esq.**

- 24 -