FILED
2003 DEC 15  P 1: 20
US DISTRICT COURT
HARTFORD CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KWEKU HANSON<br>individually and on behalf of<br>all others similarly situated<br>    Plaintiff,<br><br>v.<br><br>OCWEN FEDERAL BANK, et al.<br>    Defendants. | No. 3:02-CV-960(CFD)<br><br><br><br><br><br><br><br>DECEMBER 15, 2003 |

<u>PLAINTIFFS' OPPOSITION TO OCWEN FINANCIAL CORPORATION'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF ON IT'S FED.R.CIV.P. 12(b)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION</u>

Pursuant to applicable Fed.R.Civ.P. and D.Conn.L.Civ.R. provisions, Plaintiffs submit this statement in vigorous opposition to the blatantly bogus and totally tardy orchestration by Ocwen Financial Corporation (Ocwen Financial) to obtain an additional opportunity to reargue matters under advisement since April 10, 2003. Instead of coming completely clean concerning its factually false representations to this Court regarding its Connecticut contacts, Ocwen Financial seeks to condition such cookie-container confession on its "right" to file a reply brief.

Plaintiffs oppose such outlandishness in its entirety. There is no justification for supplemental briefing whatsoever. In fact, the Court's only justified response is sanctions and fees!

**ORAL ARGUMENT AND TESTIMONY MAY BE REQUIRED**

- 1 -

Ocwen Financial, which uses fraud as a compass, would have this Court extend to it the courtesy of covering up its torrid tracks by affording it a contrived chance to belatedly explain why it is just learned about the existence of its Wallingford leasehold and also why a lease confers no personal jurisdiction.

Anyone able to believe that Ocwen Financial (a company which has operated at an ostensible loss for all but two of the last eight quarters), can forget about its real estate investments, is a chief candidate for being sold the Brooklyn Bridge. Anyone in Ocwen's camp optimistic enough to believe that this Court will fall for the rusty ruse that *even after Plaintiffs brought the existence of Ocwen Financial's lease to the attention of both this Court and Ocwen way back in April, 2003*, Ocwen did not do due diligence (before filing its false attestation that it was a different subsidiary which leased the premises), must take this Court for a really gullible entity, and Plaintiffs for suckers.[1]

---

[1] This Sword of Damocles litigation has so reportedly rankled Ocwen that it has seen fit to keep adding lawyers *pro hac vice*, although it is an open secret that it really has the benefit of the collaboration of Connecticut's two biggest law firms (and probably closely coordinated cooperation from Litton's defense counsel). With such stellar stalwarts pitted against Plaintiffs' pittance, it is remarkably incredulous that it is only eight months after being squarely put on notice by Plaintiffs that Ocwen Financial has been able to verify that it is indeed a lessee in Wallingford; indeed, it is mind-boggling!

Does it make even secondary-school sense for Ocwen's legal department and defense team to be finding out *just now* who is on what corporate lease? Or is Ocwen Financial so loaded with money (notwithstanding its SEC filings to the contrary until recently) that it does not even bother to know what *Connecticut* properties it leases and is financially liable for? *Such sophomoric statements* simply strain common sense and verge on the absurd.

Moreover, the Wallingford premises are not the only realty interests of Big Daddy Ocwen (Ocwen Financial) as opposed to Baby Boo Ocwen (Ocwen Federal Bank). During the time-span covered by the Amended Complaint Ocwen Financial owned (and upon belief still owns) land in Danbury's Still River Corridor (with membership in the Still River Alliance).[2] Will Ocwen Financial once again deny via an affidavit its ownership interests? Or will it seek to sit on the Danbury disclosure for eight months before telling this Court that "in-house and outside counsel for Ocwen Financial learned for the first time that Ocwen Financial was named as the [owner] of the [land] in [Danbury]"?

---

[2] However, as Plaintiffs have oft tried to impress upon this Court, Ocwen <u>never</u> voluntarily reveals the truth in litigation (and maybe in governmental reports) unless confronted by empirical evidence of numbers-fudging. Indeed, even then, corporate counsel calmly chalks off such charges as "baseless."

-3-

During the November 24, 2003 hearings before Magistrate Judge Garfinkel, Plaintiffs billboarded (via Hanson's statements) that Plaintiffs *know* the true facts relating to *each* discovery inquiry propounded to Ocwen. Plaintiffs emphasized that the key reason for trying to force Ocwen to respond to their discovery demands was to catch Ocwen lying red-handed. Apparently---unlike their attitude so many previous occasions----the Ocwen defendants this time elected not to call Plaintiffs' bluff, but chose to create an aura of affirmatively disclosing adverse information.

Maybe this was because shortly after that 11/24/03 hearing Plaintiffs released to Defendants sworn statements submitted by persons until relatively recently working out of Ocwen's Orlando loan servicing facility. Affidavits ardently attesting to ongoing fraud and loan mishandling at Ocwen by persons with supervisory responsibilities whose credentials Ocwen (and/or Moss Codilis) cannot easily impeach (without at a minimum playing squarely into Plaintiffs' accusations that incompetent, ill-trained workers are hired).[3] Such ex-workers are willing to testify "live" in Court!

---

[3] Applicable Second Circuit precedent now obligates this Court to consider such pleadings-supplementary Affidavits (now unsealed and part of the public file), in its decision-making process vis-vis Defendants' Fed.R.Civ.P. 12 motions to dismiss.

-4-

Additionally, during that November 24, 2003 magisterial hearing, counsel for *Moss Codilis* made a startling concession: that "some Moss Codilis workers were deputized to work within Ocwen's facilities."[4] Plaintiffs had invoked this very claim of an incestuous relationship between Ocwen and Moss and the intermingling of Ocwen and Moss Codilis workers as one of the bases for this Court's long-arm jurisdiction over Ocwen Financial.[5]

Assuming *arguendo* that it was Moss Codilis employees deputized to the Ocwen-Moss Codilis debt collection "joint venture" who mishandled Hanson's loan or hurled invectives at him (cf. Amended Complaint, ¶¶269 to 289 [Shelly Blanton, Stephanie Carson, "Ana"]), would not this go to the question of long-arm personal jurisdiction over Ocwen Financial for torts committed within Connecticut against Hanson? Ocwen Financial and Moss Codilis were all squarely on notice as a result of Plaintiffs' allegations, as well as arguments made in Plaintiffs' Omnibus Opposition. Yet, they elected to hide behind bogus barriers.

---

[4]  Comment of Basil Shiber, Esq., co-counsel for Moss Codilis defendants. Such concession is regrettably 8 months late!

[5]  Given the Moss Codilis concession, this Court must now accept as undisputed, Plaintiffs' claim that Ocwen and Moss Codilis shared workers, and factor it in for long-arm purposes.

-5-

*If* Ocwen is not permitted to tardily attempt to explain away the truth, what stops the satellite Moss Codilis defendants from also coming in and imploring this Court to allow them to file supplemental briefs to explain away why, notwithstanding their dirty dalliances with the Ocwen defendants there is no personal jurisdiction over them? And what will impede *Plaintiffs* from filing reply briefs in a never-ending monkey-weasel chase?

The briefing period regarding Defendants' Fed.R.Civ.P. 12(b) motions closed eons ago. All sides to the litigation fully briefed the myriad contentions in this case, including filing supplemental briefs.[6] Ocwen's deliberate misrepresentations (or implausibly inadvertent misstatements) provide insufficient good cause for Ocwen to revisit the issue of *in personam* jurisdiction or any aspect of Defendants' miscellaneous motions to dismiss.[7]

---

[6] Presumably, each individual and group defendant hit Plaintiffs with their best shot, firing away in a coordinated ambush reminiscent of the coordinated anti-coalition attacks.

[7] To permit Ocwen to revisit issues fully briefed and orally argued as far back as 4/10/03, and now under advisement, will result in this case *never* moving forward meaningfully, by delaying *ad nauseam* Defendants' duty to answer the allegations in Plaintiffs' *verified complaint*; by triggering another round-robin of motion practice vis-a-vis Rule 12; by astronomically adding to the parties litigation costs. This Court cannot, consistent with considerations of judicial economy, case closure or potential prejudice to Plaintiffs, countenance such continuing charades.

-6-

Ocwen Financial's motion at bar is patently frivolous, and this Court's reopening Pandora's Box at Ocwen's behest would be tantamount to an abuse of discretion, if not a downright case of prejudicial error.[8] The motion should be decisively denied.[9]

Further, this Court should sanction Ocwen Financial for its interminable delay before conceding easily verifiable facts. Sanctions are appropriate as Ocwen masked its admission with the temerity of a motion for further briefing, as if such a belated brief would brush away its audacious April 10th denials. Indeed, one would assume that this Court, which may well be on the verge of issuing its 12(b)(6) ruling, relied on the false denials of realty ties, and now has to rework its impending decision.

---

[8] Ocwen Financial is trying to get the goal posts moved further back after the hockey game is underway, an impracticality for two reasons: (1) The plexiglass enclosure prevents the goal posts from being moved back. (2) This Court already blew the time-out whistle and ordered the players off the ice. With the Home Team (Plaintiffs) having left the arena, the Away Team (Defendants) too should have stopped skating instead of trying to sneak in a last-minute puck shot. It is incumbent upon this Court to roll the Zamboni of finality over the shards of ice and deny Ocwen's efforts to escape the penalty box. This Court must toss away Ocwen's irresponsible "motion to reargue" the way as a municipal snow-sander shovels stale snow off side streets.

[9] As a corollary to that deft denial of Ocwen's dilatory motion, Plaintiffs hereby ask this Court to award them their reasonable fees and costs incurred in diverting precious time and resources away from substantive matters to oppose this ill-advised, ill-timed, motion for leave to file supplemental brief.

Respectfully submitted,

_____
Paul M. Ngobeni (#ct08187)
Law Offices of Paul Ngobeni
914 Main Street, Suite 206
East Hartford, CT 06108
Telephone: (860) 289-3155
Facsimile: (860) 282-7479

CERTIFICATION

A copy of Plaintiffs' **Opposition to Ocwen Financial Corporation's Motion for Leave to file a Supplemental Brief on its Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction** was mailed December 15, 2003, postage prepaid, to:

Steven M. Greenspan, Esq.
David M. Bizar, Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100 Fax (860) 275-0343

Basil S. Shiber, Esq.
Richard G. Carlston, Esq.
Miller, Starr & Regalia
1331 N. California Blvd. 5th Floor
P. O. Box 8177
Walnut Creek, CA 94596
(925) 935-9400

Luigi Spadafora, Esq.
Peter R. Stark, Esq.
Winget, Spadafora & Schwartzberg
45 Broadway, 19th Floor
New York, NY 10006
(212) 221-6900 Fax (212) 221-6989

Matthew Budzik, Esq.
Francis J. Brady, Esq.
Murtha Cullina LLP
CityPlace I, 185 Asylum Street
Hartford, CT 06103
(860) 240-6000 Fax (860) 240-6150

Theodore R. Scarborough, Esq.
Sidely, Austin, Brown & Wood
Attorneys at Law
Bank One Plaza
Chicago, IL 60603
(312) 853-7036 Fax (312) 853-2236

Kweku J. Hanson, Esq. (*Pro Se*)
Law Offices of Kweku J. Hanson
487 Main Street, Suite Two
Hartford, CT 06103-3007
(860) 728-5454 Fax (860) 548-9660

_____
Paul M. Ngobeni, Esq.