UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
_____
KWEKU HANSON                    )    No. 3:02-CV-960(CFD)
individually and on behalf of  )
all others similarly situated  )
        Plaintiff,             )
                               )
        v.                     )
                               )
OCWEN FEDERAL BANK, et al.     )
        Defendants.            )
_____)    JANUARY 5, 2003
```

PLAINTIFFS' OBJECTION TO OCWEN'S MOTION
FOR DISGORGEMENT OF PRIVILEGED DOCUMENTS

By filing on or about November 21, 2003 a totally baseless and rather audacious self-styled "motion for disgorgement of privileged documents," [Docket #205] Ocwen wishes to relegate this August Court to "a mere errand boy . . . which may chose to pick some people's chestnuts from the fire, but not others'." First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 763 (1972). However, Ocwen should not be allowed to bully, bluff or bluster its way into this Court with demonstrably dirty hands and manipulate this litigation. As expounded below, Ocwen's meritless motion must be denied.

ORAL ARGUMENT IS REQUESTED
TESTIMONY WILL BE REQUIRED
ARTICULATION IS REQUESTED

- 1 -

1.   Background Considerations:

Ocwen has long been galled by the realization that despite its despotic workplace environment, some of the people who worked within the walls of its Orlando facility did not do robotic obeisance to Ocwen. Starting within two months after Plaintiffs brought this putative nationwide class action lawsuit against Ocwen and its corrupt cohorts, Hanson received mailings via Airborne Express, Federal Express and/or U.S. Postal Service courier or regular mail, postage prepaid. These packages had no identifiable sender name, but some were marked "Ocwen mailroom."

As the initial mailing looked like (and in one instance was) his loan records, Hanson at first blush thought that Ocwen had belatedly tried to salvage its salacious image by finally furnishing him his real loan records.[1] Thereafter, Hanson received certain email records which self-evidently showed that several Ocwen's customers were being engaged in a game of frustration by Ocwen's customer relations department in much the same way as Plaintiffs alleged in the Amended Complaint.[2]

---

[1]   This Court should factor into its decision on this motion the fact that eighteen months into this litigation, Ocwen has not given Hanson his complete loan records, redacted or not.

[2]   Said emails, which became the subject of skirmishes between the adversarial parties, showed Ocwen customers irate

- 2 -

Upon information and belief, not too long after the lawsuit at bar was filed, word spread like wildfire within Ocwen's Orlando facility---used simultaneously by Moss Codilis workers---that a lawyer-victim had sued Ocwen.[3] By mid-August, 2002 some ex-employees of Ocwen proactively contacted Plaintiffs.[4] These ex-employees imparted general, non-customer, information involving fraudulent/unethical servicing practices rife at Ocwen.

More or less a short time later, some persons later identified as Moss Codilis workers contacted Hanson and expressed interest in relaying evidence directly to this Court. Plaintiffs, perennially inculcated to believe that litigation entails a *search for truth*, assented and told the moles that they would serve as a confidential conduit for channeling whistleblower information to this Court for its *ex-parte, in camera* inspection.

---

over delays in: posting payments allegedly timely sent; obtaining payoffs; reaching humans at customer relations; plus problems accessing accounts online; and false credit reporting to credit bureaus.

[3] Pseudonymous reports posted at www.RipOffReport.com by alleged current employees of Ocwen indicated that knowledge of the existence of the Hanson v. Ocwen lawsuit was widespread among Ocwen's employees and several hoped to help out, but in covert ways for fear of losing their livelihoods.

[4] In some instances, initial, gratuitous, contact was made through Kweku Hanson (hereinafter "Hanson"); in other cases the informant contacted Plaintiffs' counsel directly.

The mole material was tendered to this Court through Plaintiffs, who dutifully filed it *ex parte* under seal for the Court's consideration. That the information was intended for the Court's direct review versus for ammunition by Plaintiffs is seen in two examples: the Affidavits of Rosely Torres and Dracheka Campbell each indicates *to the Court* that the affiant apparently is willing to come up and testify confidentially to the Court.

Nevertheless, presumably after *ex parte* review, this Court ultimately declined to consider the material Plaintiffs filed under seal. After a contentious hearing regarding Ocwen's emergency motion for discovery instanter, Plaintiffs followed this Court's very specific suggestion that Hanson share any evidence of wrongdoing with appropriate law enforcement entities. Hanson handed over considerable documentation to the FBI's Connecticut office. To thwart potential burglaries, Plaintiffs also disseminated documents detailing fraud on the part of Ocwen---including anonymously received material—to randomly selected putative plaintiffs, and a couple of news organizations from among the dozen or so media outlets which were hounding Hanson.[5]

_____

    [5]    The distribution was done in the same spirit shown by Ocwen in shredding discoverable documents between the time Plaintiffs filed a motion for electronic data preservation and

<u>Legal Considerations</u>

Disgorgement is usually used in securities and bankruptcy litigation to force a party undeservedly retaining funds to regurgitate them. *See*, e.g. <u>CFTC v. AVCO Fin. Corp.</u>, 28 F.Supp. 2d 104, 122 (S.D.N.Y. 1998). As a threshold matter, disgorgement is an equitable remedy. Given that disgorgement is an equitable remedy, the proponent of a motion for disgorgement must come into court with clean hands.

It is virtually unheard of for a court to order disgorgement of documents without a showing they were fraudulently obtained. Plus, under the clean hands maxim, Ocwen is patently disqualified from being heard on the merits of its motion for disgorgement.

Rather than reinvent the wheel (or more appropriately rewrite the script), to invoke a colloquialism, Plaintiffs will cull from a recent, related pleading, their argument about Ocwen's unabashedly unclean hands.[6] Thus, Plaintiffs' pleadings on the issue will resonate with consistency before this Court (and/or any appellate body before which this lawsuit may wind).

the denial order, several months later, by Magistrate Garfinkel.

[6]    Argument on pages 6 and 7 is excerpted from Docket Entry #188 [Plaintiffs'] Opposition to Motion to Modify Amended Scheduling Order and for Rule 16 Scheduling Conference.

Unclean Hands Doctrine Bars Granting Ocwen's Motion

The maxim of unclean hands is based on the principle that "since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff."[7] 11A C. Wright, A. Miller, M. Kane, Federal Practice and Procedure: Civil 2d §2946, at 108 (1995). "[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co., 324 U.S. 806, 814-15 (1945); cf. Warner Bros. Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983) ("[T]he defense of unclean hands applies only with respect to the right in suit.").

Accordingly, a litigant will be barred from relief by the clean hands maxim where he has been guilty of unlawful or inequitable conduct in matter with relation to which he seeks relief. Concededly, "[t]he unclean hands defense is not an automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise

_____

[7]    In the context of the motions at bar Defendants, as movants, are the "plaintiffs" for unclean hands analysis.

its discretion and grant an injunction." 11A Wright, Miller, Kane, <u>Federal Practice and Procedure: Civil 2d</u> §2946, at 111. "The doctrine of unclean hands also may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff." *Id*. §2946, at 112; *cf*. <u>A.H. Emery Co. v. Marcan Prods. Corp.</u>, 389 F.2d 11, 18 (2d Cir. 1968).

Thus, in determining whether the doctrine of unclean hands bars an equitable remedy, courts are permitted to weigh the wrongdoing of the plaintiff against the wrongdoing of the defendant. 11A Wright, Miller, Kane, <u>Federal Practice and Procedure: Civil 2d</u> §2946, at 112. Where the wrongful conduct of both parties are remarkably similar in quality and extent, equity requires this Court to look to whether the defendants' wrongdoing alleged in the complaint is of a greater magnitude than the plaintiff's wrongdoing. <u>Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC</u>, 149 F.3d 85 (2d Cir. 1998). Measured by that yardstick, there is absolutely no question that Ocwen's wrongdoing as alleged in the Amended Complaint (and corroborated by several sworn statements submitted by ex-workers and consumers) is of an incomparably greater magnitude than any imagined wrong by Hanson.

<u>Third-Party Disclosure Waiver And/Or The Attorney-Fraud
Exception Eviscerates Any Legitimate Privilege Claims</u>

Ocwen asserts that the records are subject to both the attorney-client and work product privilege, and therefore should not be divulged to either the public or the press. Ocwen further asks that this Court order Plaintiffs to cough up all copies of all documents for return to Ocwen, and that Plaintiffs pleadings be withdrawn from the record and placed under seal.

Accepting *arguendo* that Moss Codilis was at all relevant times not just a conspiratorial collection agency masquerading as a law firm, but was a true law firm in structure and function, it becomes apparent that Ocwen is not entitled to disgorgement. First, this Court would have to make an *in camera* inspection of scores of pages of documents to determine whether they fall within the penumbra of attorney-work product, because most of them on their face are not attorney-client communications.[8]

---

[8]    Bank secrecy statutes are unhelpful to Ocwen's claim, because Congress sought to create financial institution liability for malicious disclosures, but not disclosures by financial institution employees aiming to expose banking/corporate fraud. Moreover, each Ocwen borrower reached by Plaintiffs has only too eagerly consented verbally or in writing to the wholesale disclosure of his or her financial data to the extent necessary to expose and fight this frighteningly feckless fraud.

- 8 -

The common interest rule, also known as the joint defense privilege, preserves the confidentiality of communications between two or more parties and their attorneys who are engaged in a joint defense effort. Metro Wastewater Reclamation Dist. v. Continental Cas. Co., 142 F.R.D. 471, 478 (D. Colo. 1992). It has been widely accepted by courts throughout the United States. *Id.* (citing John Morrell & Co. v. Local Union 304A, 913 F.2d 544, 556 (8th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991); United States v. Schwimmer, 892 F.2d 237 (2d Cir. 1989); Waller v. Financial Corp. of Am., 828 F.2d 579 (9th Cir. 1987)). The rule applies to both attorney-client and work product privilege. In re Grand Jury Subpoenas, 902 F.2d 244, 249 (4th Cir. 1990).

Under the common interest rule, waiver of the privilege requires the consent of all parties who share the privilege. John Morrell & Co. v. Local Union 304A, 913 F.2d 544, 556 (8th Cir. 1990), *cert. denied*, 500 U.S. 905, 114 L. Ed. 2d 78 (1991); In re Grand Jury Subpoenas, 902 F.2d at 248; Metro Wastewater Reclamation Dist., 142 F.R.D. at 478. In accordance with the common interest rule, the disclosure of the letter ordinarily could not waive the privilege without the consent of all of the defendants, each of whom share the privilege.

However, the Ocwen and Moss Codilis defendants specifically have placed in issue the legitimacy and reasonableness of their continued conspiratorial cheating, using Moss Codilis-supplied software and letterheads for cover as to Ocwen's loan serving and default designation policies and practices. Plaintiffs, for their part, are using the documents sought to be disgorged for the express purpose of responding to such bad faith defenses. Raising the attorney-fraud exception waives both the attorney-client and work product privilege to the extent that the privileged information may be relevant to the qualified immunity issue. Buford v. Holladay, 133 F.R.D. 487, 495-496 (S.D. Miss. 1990).[9]

Thirdly, distribution of the documents sought to be disgorged to anyone outside of Ocwen and Moss Codilis would have resulted in a waiver of the attorney-client privilege. Moreover, having been divulged to third parties, the documents can be used against Ocwen officers and the Moss Codilis defendants in their individual capacities to show awareness of the matters presented therein for purposes of determining their liability for damages.

_____

[9]    Since Defendants placed the issue of their own knowledge of the law before the Court in asserting good faith, any privilege that attaches to the documents have been waived, at least vis-a-vis a bad faith claim.

As evidenced by their various pleadings, Plaintiffs are relying heavily upon the documents at bar to show that the defendants knew that they were violating the putative plaintiffs' statutory and common law rights by continuing their pattern and practice of fraudulently servicing consumer loans. As regards Hanson's authentic loan record, for example, Todd Kettle's entry warning against foreclosure specifically states why Frank Pabst has determined that the loan history will not justify foreclosure. There is nothing about seeking or receiving *lawyerly* advice in those computer entries. Rather, they reveal a loan servicing shark wrestling with how to cover its tracks in face of a very aggressive homeowner determined not to be the next domino.

It bears highlighting that during the eighteen month period in which this case has hiccupped its inexorable march towards justice, Plaintiffs have heard, and received unsolicited records, articles, documents, etc., from a smorgasbord of sources. Among these sources were countless, unsolicited, emails received directly from Ocwen consumers claiming in the most heart-wrenching terms to be victims of consummate corporate fraud.[10]

---

[10]    Plaintiffs conservatively estimate the emails received as numbering 1,000, but because of vicious vires (some www.Ocwen.com-originated) which wrecked Hanson's computers and forced

Such consumer emails oftentimes included loan and financial information details, or were followed up with sworn statements which included social security and loan account numbers, credit reports, canceled checks, and Ocwen correspondence. Plaintiffs heard from a bevy of broadcast and print journalists interested in reporting the lawsuit. Hanson heard from several lawyers nationwide who frustratingly faxed client records reflecting Ocwen's feckless fraud against their clients.[11]

Plaintiffs heard from Connecticut Assistant Attorney General for Consumer Protection Neil Fishman, Esq., as well as an assistant attorney general for the Connecticut Banking Department. Internet websites also proactively sent what Ocwen would like to consider proprietary customer information to Plaintiffs. After Hanson posted notice of the existence of his lawsuit against Ocwen online, www.classactionamerica.com and www.bigclassact.com each generated scores of Ocwen customer complaints to Plaintiffs.

─────────────────

frequent reformatting, some emails were irretrievably lost.

[11]    Hanson reciprocated, reticent regarding this national nightmare Ocwen perniciously propagates despite empirical evidence of its vicious victimization. Consequently, countless consumer complaints were disseminated *ad hoc* to reporters, lawyers and putative plaintiffs and are now in the public domain.

Ocwen customers who trolled the internet looking for help in dealing with Ocwen's far-flung fraud also utilized www.ripoffreport.com as a primary resource in independently reaching Plaintiffs. Some class action lawyers have created websites to solicit information from victims and whistleblower workers of entities they plan to sue or have sued. Others have set up sites online to receive consumer complaints.[12] Plaintiffs did not proactively seek staff of Ocwen, Moss Codilis or Litton.

Plaintiffs Have Committed No Fraud Warranting Disgorgement

Disgorgement should be ordered only when it is clear that ill-gotten gains have been realized and that such gains are attributable to proven violations of the rules of discovery. Scienter is a state of mind embracing an intent to deceive, manipulate or defraud. Aaron v. SEC, 446 U.S. 680 (1980). Scienter is established by showing that a party acted intentionally or with severe recklessness. Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir. 1982).

---

[12]     For example, Lief Cabraser Heman & Berman, LLP, out of San Francisco, which has been effusively praised by federal judges and has recouped multibillion dollar verdicts, set up a web page specifically to receive complaints involving Ocwen, prior to actually filing a California consumer class action lawsuit against Ocwen.

As "truth will out", conscientious past or present personnel operating out of Ocwen's Orlando offices, decided to divulge information to this Court and to Plaintiffs. At no time did such persons reveal the methodology of Ocwen's software programs or any other trade secret. At no time did such persons pass on information which they did not obtain in the regular course of their work responsibilities.

More importantly, *at no time did such persons divulge any disputed information after having signed any confidentiality agreement with any defendant.*[13] Moreover, said persons did not believe that Moss Codilis is a law firm the way *e.g.* Moss, Pite & Duncan LLP is a real law firm.[14] These are actual people who worked within Ocwen's facilities, and were promoted, reassigned, laid off or fired by *Ocwen* management while ostensibly employed by a phantom law firm. There is no issue of scienter here!

---

[13]    After disgraceful pressure, Dracheka Campbell, Rosely Torres and other persons acquiesced and signed Intellectual Property and other confidentiality agreements. However, said agreements had been disseminated to their own counsel and others for review prior to signing same, and Plaintiffs wound up getting unsigned copies of said confidentiality agreements.

[14]    Moss Codilis in actuality is as much a law firm as Cal-Western Reconveyance, another genius, foreclosure-facilitating, creation of defendants Gerald Moss Codilis, Ernie Codilis and their ilk.

Effectively the information at issue (1) came mainly from public sources in which Ocwen has no legitimate claim to a proprietary interest; (2) has been disseminated to other, public domain, entities and it would be futile to order any disgorgement as some of the material has been utilized by third-parties in mass-media reports, complaints to Congressional representatives, administrative agency complaints, and/or in unrelated pending litigation. Hanson *never* sought out or relied on any confidential sources. To the extent that the material is "out there" or inexorably commingled, Ocwen is not entitled to disgorgement.[15]

Relying on a panoply of part-time paralegal productivity, and seasoned secretarial services, Plaintiffs put together a dynamic database of Ocwen victims. With often-overlapping information, and time-and-manpower constraints dictating that all data be scrambled in (omelette-style), and due to justifiable paranoia about computer tampering efforts, Plaintiffs did not engage in a delicate dance of daintily denoting the source-material for each entry in that compilation. The manuscript catalog was not source-segregated as it was being composed.

---

[15] Ocwen is as much entitled to disgorgement of the records at issue as Enron was entitled to the shredding of the corporate records at issue in that civil and criminal litigation.

Ocwen is seeking disgorgement of computer notes from its *de jure* or *de facto* workers, emails between Moss Codilis workers and third parties pertaining to nonlegal matters that would not be protected by the attorney-client or work-product privileges. Only Ocwen's lawyers can invoke a work-product privilege.[16] Hanson is entitled to resort to innocently-obtained records, including those relating to him, to robustly rebut such disgraceful dissembling and to document his claims of defalcation and embezzlement of fiduciary funds by Ocwen.[17] Thousands of innocent homeowners who dutifully paid their mortgages also deserve legal protection. The record at bar are their only insurance policy!

---

[16] And Moss Codilis is certainly *not* a law firm for Ocwen, despite the casual representation to Judge Garfinkel on November 24, 2003. Can a law firm legitimately exist anywhere in the U.S. without being registered *somewhere*? As of October 1, 2003 Moss Codilis was neither registered in Alabama, California, Colorado, Florida, Georgia, or New Jersey as a law firm. It was registered in some states (including Connecticut) as a collection agency and is not by its very structure a real law firm. In face of Plaintiffs' repeated challenge, this Court is duty-bound to investigate the legitimacy of such wool-over-the-eyes claims by Moss Codilis before accrediting it as a law firm in this case.

[17] A chairman of the ABA's Litigation Section wisely noted that there is a fundamental philosophical problem posed by marrying a disclosure system and an adversary system of justice. A disgorgement order would simply inject another layer of uncertainty--and therefore potential for dispute and more pretrial maneuvering--into the arena of this already murky case.

Ocwen's motion is fraught with mischief because it ignores both the work product doctrine and attorney-client privileges, as well as the practical realities of notice pleading. A disgorgement mandate would require Plaintiffs to engage in a wholesale disgorgement of documents, including records protected by attorney-client and attorney work-product privileges inuring to Plaintiffs. Plus, many of the documents sought to be disgorged may ultimately have little relevance to the litigation.[18]

If the history of this litigation is any guide, Plaintiffs can scarcely imagine the extraordinary number of magisterial or judicial hearings that will be necessary to administer the requested order.[19]

---

[18]    Plaintiffs' overproduction of documents (including records not obtained from moles at Ocwen's Orlando facility) as Plaintiffs attempt to avoid dilatory challenges and sanctions, will ensue, with the likelihood of harm to Plaintiffs' cause.

[19]    Increased costs, delay, and burden on this Court would ensue from any such disgorgement order as the parties file motions for sanctions for failure to disclose and preemptive cross-motions to protect themselves from such sanctions. Adjudication of these motions will be difficult, given the absence of precise benchmarks against which to measure Plaintiffs' disgorgement. Hickman envisioned a process through which discovery would "narrow and clarify the basic issues between the parties." Id. 395 U.S. at 501.

Ocwen sought to redact incriminating evidence from Hanson's loan file, but was thwarted. Now it not only seeks to brazenly co-opt this Court's assistance in subverting justice by having the Court purge Plaintiffs' submissions which prove Ocwen's wrongdoing and which go to the heart of the matter, but it would destroy discovery by forcing Plaintiffs to disgorge documents.[20]

There is no statute, court rule or caselaw which requires Plaintiffs to make the sort of "excuse me, would you like these back" disclosures that Ocwen would like this Court to adopt by way of precedent. Nor is there any evidence of a standardized custom or practice in the District of Connecticut for such affirmative disclosures. Indeed, there is no universal disclosure standard at all in such cases. These material are fully discoverable and Ocwen should be thankful that Plaintiffs did not put it to the expense of producing them or fighting even harder to suppress them. Instead, Plaintiffs have borne the expense and effort in imparting to Ocwen all the relevant records Plaintiffs have, without conditioning same on Defendants' *quid pro quo*.

---

[20] Instead of digressionary disgorgement, an order obligating Ocwen to accurately account for Hanson's loan payments must issue as a *pendente lite* matter; resolution of that thorny issue will accelerate disposition of the merits of the case.

- 18 -

Ocwen cannot claim a trade secret privilege in records whose subjects have volitionally divulged those records to Plaintiffs, and has no right to ask this Court to suppress such legitimately-disclosed records. Nor can it claim customer confidentiality or a work-product privilege in the records.

The facts and litigation history here do not support the notion of illegitimate tactical advantage. Nor, is it in the public interest, especially when countless consumer have been victimized precisely because Ocwen shrouds servicing of loans in a cloud of confusion and a fog of fraud, to protect the prevaricator from public purview.

Just as was the case with Ocwen's imperious motion for discovery instanter, there is no basis for ordering Hanson or counsel to cease or desist in communicating with victims, for sanctioning Plaintiffs, or for ordering any disgorgement. Scienter is required and Ocwen can make no such showing. "Disgorgement [would be] an exorbitant, and therefore inequitable, remedy." Montana v. Crow Tribe of Indians, 523 U.S. 696, 711 (1988).[21]

---

[21] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir. 1994).

- 19 -

Rome should not have to burn in a big bonfire simply in order to give rise to the expression that "Nero fiddled." Likewise, this Court cannot countenance continuing cover-up charades simply in order for Ocwen to justify wearing running shoes as it sprints around a circular coliseum in an effort to escape liability.[22] Wherefore, Plaintiffs respectfully ask this Court to deny Ocwen's motion for disgorgement and to articulate its decision so as to deter Ocwen or any other defendant from pursuing futile remedies.

Respectfully submitted,

_____

Paul M. Ngobeni (#ct08187)
Law Offices of Paul Ngobeni
914 Main Street, Suite 206
East Hartford, CT 06108
Telephone: (860) 289-3155
Facsimile: (860) 282-7479

---

[22]    Over 90% of federal civil cases either are settled or are otherwise disposed of before trial, so a significant portion of today's attorneys' fees come from pretrial activities. In fact, some ABA-member law firms report that they derive more than half of their gross income from discovery. Thus, some attorneys may have a clear financial incentive to use and overuse discovery in pursuit of greater economic reward. While there may not be any tangible evidence that such is the case here, it is indisputable that Ocwen hopes to fervently frustrate Plaintiffs' lawsuit. No less persons than as Ocwen President Ronald Faris and Ocwen General Counsel & Senior Vice President Paul Koches have twice called Hanson's claims baseless in as many months.

- 20 -

## CERTIFICATION

A  copy  of  Plaintiffs'  Motion  to  Strike  Ocwen  Financial
Corporation's  Unauthorized  and  Untimely  Rule  12(b)(2)
Supplemental  Brief  was  mailed  January  _____,  2004,  postage
prepaid,  to  the  following  counsel  and  *pro se* parties:

```
Steven M. Greenspan, Esq.          Matthew Budzik, Esq.
David M. Bizar, Esq.               Francis J. Brady, Esq.
Day, Berry & Howard LLP            Murtha Cullina LLP
CityPlace I                        CityPlace I, 185 Asylum Street
Hartford, CT 06103-3499            Hartford, CT 06103
(860) 275-0100 Fax (860) 275-0343  (860) 240-6000 Fax (860) 240-6150


Basil S. Shiber, Esq.              Theodore R. Scarborough, Esq..
Richard G. Carlston, Esq.          John Van De Weert, Esq.
Miller, Starr & Regalia            Sidely, Austin, Brown & Wood
1331 N. California Blvd. 5th Floor  Attorneys at Law
P. O. Box 8177                     Bank One Plaza
Walnut Creek, CA 94596             Chicago, IL 60603
(925) 935-9400                     (312) 853-7036 Fax (312) 853-2236


Luigi Spadafora, Esq.              Kweku J. Hanson, Esq. (Pro Se)
Peter R. Stark, Esq.               Law Offices of Kweku J. Hanson
Winget, Spadafora & Schwartzberg   487 Main Street, Suite Two
45 Broadway, 19th Floor            Hartford, CT 06103-3007
New York, NY 10006                 (860) 728-5454 Fax (860) 548-9660
(212) 221-6900 Fax (212) 221-6989
```

_____

**Paul M. Ngobeni, Esq.**

- 21 -